1 | David L. Wiseman (State Bar No. 246913)
LAW OFFICES OF DAVID L. WISEMAN
2 | 455 Capitol Mall, Suite 350
Sacramento, CA 95814
3 | Telephone: (916) 441-6575
Facsimile:   (916) 441-6553
4 | E-mail address: wiseman@thewisemanlawfirm.com

5 | Matthew J. Sill (OK State Bar No. 21547)
SILL LAW GROUP, PLLC
6 | 14005 N. Eastern Avenue
Edmond, OK 73103
7 | Telephone: (405) 509-6300
Facsimile: (405) 509-6268
8 | Email Address:  matt@sill-law.com

9 | Attorneys for Plaintiff(s)

10

11 | **UNITED STATES DISTRICT COURT**

    **EASTERN DISTRICT OF CALIFORNIA**
12

13 | MARK AGUILAR, LORRAINE NELSON,        )    CASE NO.:
JEFFREY DIEGUEZ, HARRY WILLIAMS,       )
14 | SARAH YOUNG HOPES, HOWARD HERRING,    )
TIFFANY JACKSON, JACQUELINE            )
15 | TEMPLETON, ALENE FAIR, MARK PAUL,     )    **COMPLAINT FOR DAMAGES**
BRICE SCHEMMEL, LATANNA THOMPSON,      )    **DEMAND FOR JURY TRIAL**
16 | AMBER CASPER RODERY, JOSEPH PACE,     )
ASHLEY CLAYTON, JOHN LOCKETT,          )
17 | KENNETH LEONAS, RANDI ROBINSON,       )
SHARON STONE, MARK SWEENEY, GEORGE     )
18 | WARD, BARBARA WOLFF, PAMELA           )
KIRKMAN, DALE PENNINGTON, JIMMY        )
19 | FOSTER, RYAN MULLANY, BRANDON         )
BORING, DANIEL COBLER, JR., MICHAEL    )
20 | MOHR, LAURETTE JOHNSON, RONALD        )
THORNTON, PERRY LYONS, TONIA TIBBS,    )
21 | GREGORY BLISS, CHRISTOPHER LUFT,      )
JASON BOYD, JENNIFER FIFE, ROBIN       )
22 | YOUNG, MARCIA HOMAN,                  )
23 |                                       )
24 |           Plaintiffs,                 )
                                          )
25 |      vs.                              )
                                          )
26 |                                       )
INTERHEALTH NEUTRACEUTICALS            )
27 | INCORPORATED; IOVATE HEALTH           )
SCIENCES, INC.; IOVATE HEALTH SCIENCES )
28 | RESEARCH, INC.;  IOVATE HEALTH         )

1  SCIENCES GROUP, INC. N/K/A KERR )
   INVESTMENT HOLDING CORP; IOVATE )
2  HEALTH SCIENCES INTERNATIONAL, INC.; )
   MUSCLETECH RESEARCH AND )
3  DEVELOPMENT, INC.; VITAQUEST )
   INTERNATIONAL, LLC; GARDEN STATE )
4  NUTRITIONALS, INC.; HVL INCORPORATED; )
   HVL LLC; GNC CORPORATION; GENERAL )
5  NUTRITION CENTERS, INC.; RITE AID )
   CORPORATION; VITAMIN WORLD, INC; )
6  WAL-MART STORES, INC.; WALGREENS CO.; )
7  CVS CAREMARK CORPORATION; COSTCO )
   WHOLESALE CORPORATION; )
8                                            )
9           Defendants.                      )
                                             )
10 _____

11         COME NOW Plaintiffs MARK AGUILAR, LORRAINE NELSON, JEFFREY DIEGUEZ,

12 HARRY WILLIAMS, SARAH YOUNG HOPES, HOWARD HERRING, TIFFANY JACKSON,

13 JACQUELINE TEMPLETON, ALENE FAIR, MARK PAUL, BRICE SCHEMMEL, LATANNA

14 THOMPSON, AMBER CASPER RODERY, JOSEPH PACE, ASHLEY CLAYTON, JOHN

15 LOCKETT, KENNETH LEONAS, RANDI ROBINSON, SHARON STONE, MARK SWEENEY,

16 GEORGE WARD, BARBARA WOLFF, PAMELA KIRKMAN, DALE PENNINGTON, JIMMY

17 FOSTER, RYAN MULLANY, BRANDON BORING, DANIEL COBLER, JR., MICHAEL MOHR,

18 LAURETTE JOHNSON, RONALD THORNTON, PERRY LYONS, TONIA TIBBS, GREGORY

19 BLISS, CHRISTOPHER LUFT, JASON BOYD, JENNIFER FIFE, ROBIN YOUNG, MARCIA

20 HOMAN (hereinafter collectively referred to as "Plaintiffs") by and through their attorneys of record

21 complain against Defendants INTERHEALTH NEUTRACEUTICALS INCORPORATED;

22 IOVATE HEALTH SCIENCES, INC.; IOVATE HEALTH SCIENCES RESEARCH, INC.;

23 IOVATE HEALTH SCIENCES GROUP, INC. N/K/A KERR INVESTMENT HOLDING CORP;

24 IOVATE HEALTH SCIENCES INTERNATIONAL, INC.; MUSCLETECH RESEARCH AND

25 DEVELOPMENT, INC.; VITAQUEST INTERNATIONAL, LLC; GARDEN STATE

26 NUTRITIONALS, INC.; HVL INCORPORATED; HVL LLC; GNC CORPORATION; GENERAL

27 NUTRITION CENTERS, INC.; RITE AID CORPORATION; VITAMIN WORLD, INC; WAL-

28 MART STORES, INC.; WALGREENS CO.; CVS CAREMARK CORPORATION; COSTCO

<div align="center">2</div>

1  WHOLESALE CORPORATION, (collectively hereinafter referred to as "Defendants") and state as

2  follows:

3  <center>**NATURE OF THE CASE**</center>

4      1.      This is an action for damages for injuries suffered by Plaintiffs as a direct and

5  proximate result of the wrongful conduct of Defendants in connection with the design,

6  manufacturing, testing, packaging, distribution, labeling, and/or sale of Hydroxycut products,

7  including, but not limited to Hydroxycut Regular Rapid Release Caplets, Hydroxycut Caffeine-Free

8  Rapid Release Caplets, Hydroxycut Hardcore Liquid Caplets, Hydroxycut Max Liquid Caplets,

9  Hydroxycut Regular Drink Packets, Hydroxycut Caffeine-Free Drink Packets, Hydroxycut Hardcore

10  Drink Packets, Hydroxycut Max Drink Packets, Hydroxycut Liquid Shots, Hydroxycut Hardcore

11  RTDs, Hydroxycut Max Aqua Shed, Hydroxycut 24, Hydroxycut Carb Control, and Hydroxycut

12  Natural, Hydroxycut Regular Rapid Caplets, Hydroxycut Caffeine-Free Rapid Caplets, Hydroxycut

13  Liquid Caplets.

14  <center>**PARTIES**</center>

15      2.      Plaintiff, Mark Aguilar, is a citizen of the State of New Mexico, and resides in Eddy

16  County, New Mexico.  He purchased Hydroxycut products, including Hydroxycut Regular Rapid

17  Release Caplets, Hydroxycut Caffeine-Free Rapid Release Caplets, Hydroxycut Hardcore Liquid

18  Caplets, Hydroxycut Max Liquid Caplets,  Hydroxycut Regular Drink Packets, Hydroxycut Caffeine-

19  Free Drink Packets, Hydroxycut Hardcore Drink Packets, Hydroxycut Max Drink Packets,

20  Hydroxycut Liquid Shots, Hydroxycut Hardcore RTDs, Hydroxycut Max Aqua Shed, Hydroxycut

21  24, Hydroxycut Carb Control, and Hydroxycut Natural from GNC and WalMart stores in Carlsbad,

22  New Mexico.

23      3.      Plaintiff, Lorraine Nelson, is a citizen of the State of Colorado, and resides in Weld

24  County, Colorado.  She purchased Hydroxycut products, including Hydroxycut Regular Drink

25  Packets from supermarket in Windsor, Colorado.

26      4.      Plaintiff, Jeffrey Dieguez, is a citizen of the State of Florida, and resides in Brevard

27  County, Florida.  He purchased Hydroxycut products, including Hydroxycut Caffeine-Free Rapid

28  Release Caplets from WalMart and a supermarket in Melbourne, Florida.

<center>3</center>

5.      Plaintiff, Harry Williams, is a citizen of the State of Florida, and resides in Broward County, Florida.  He purchased Hydroxycut products, including Hydroxycut Regular Rapid Release Caplets, Hydroxycut Hardcore Drink Packets, and Hydroxycut Natural from GNC stores in Sunrise, Florida.

6.      Plaintiff, Sarah Young Hopes, is a citizen of the State of Florida, and resides in Charlotte County, Florida.  She purchased Hydroxycut products, including Hydroxycut Regular Rapid Release Caplets, Hydroxycut Hardcore Liquid Caplets, and Hydroxycut Max Liquid Caplets from WalMart stores in Florida.

7.      Plaintiff, Howard Herring, is a citizen of the State of Georgia, and resides in Gwinnett County, Georgia.  He purchased Hydroxycut products, including Hydroxycut Hardcore Liquid Caplets and Hydroxycut Hardcore Drink Packets from GNC stores in Norcross, Georgia.

8.      Plaintiff, Tiffany Jackson, is a citizen of the State of Georgia, and resides in Clarke County, Georgia.  She purchased Hydroxycut products, including Hydroxycut Regular Rapid Release Caplets and Hydroxycut Caffeine-Free Rapid Release Caplets from GNC and Rite Aid stores in Athens, Georgia.

9.      Plaintiff, Jacqueline Templeton, is a citizen of the State of Georgia, and resides in Gwinnett County, Georgia.  She purchased Hydroxycut products, including Hydroxycut Regular Rapid Release Caplets, Hydroxycut Hardcore Liquid Caplets, Hydroxycut Liquid Sots and Hydroxycut Natural from supermarket in Georgia.

10.      Plaintiff, Alene Fair, is a citizen of the State of Idaho, and resides in Canyon County, Idaho.  She purchased Hydroxycut products, including Hydroxycut Regular Rapid Release Caplets from Walgreens stores in Nampa, Idaho.

11. Plaintiff, Mark Paul, is a citizen of the State of Louisiana, and resides in Orleans Parrish, Louisiana.  He purchased Hydroxycut products, including Hydroxycut Regular Rapid Release Caplets and Hydroxycut Regular Drink Packets from WalMart and Walgreens stores in New Orleans, Louisiana.

12.     Plaintiff, Brice Schemmel, is a citizen of the State of Louisiana, and resides in Vernon Parrish, Louisiana.  He purchased Hydroxycut products, including Hydroxycut Hardcore Liquid Caplets from GNC stores in Louisiana.

13.     Plaintiff, Latanna Thompson, is a citizen of the State of Michigan, and resides in Cass County, Michigan.  She purchased Hydroxycut products, including Hydroxycut Regular Rapid Release Caplets from WalMart stores in Michigan.

14.     Plaintiff, Amber Casper Rodery, is a citizen of the State of Missouri, and resides in Texas County, Missouri.  She purchased Hydroxycut products, including Hydroxycut Caffeine-Free Rapid Release Caplets from WalMart stores in Mountain Grove, Missouri.

15.     Plaintiff, Joseph Pace, is a citizen of the State of Missouri, and resides in Jackson County, Missouri.  He purchased Hydroxycut products, including Hydroxycut Regular Rapid Release Caplets from Walgreens stores in Missouri.

16.     Plaintiff, Ashley Clayton, is a citizen of the State of Mississippi, and resides in Bolivar County, Mississippi.  She purchased Hydroxycut products, including Hydroxycut Regular Rapid Release Caplets and Hydroxycut Caffeine-Free Rapid Release Caplets from WalMart stores in Cleveland, Mississippi.

17.     Plaintiff, John Lockett, is a citizen of the State of Mississippi, and resides in Covington County, Mississippi.  He purchased Hydroxycut products, including Hydroxycut Hardcore Liquid Caplets from GNC in Hattiesburg, Mississippi.

18.     Plaintiff, Kenneth Leonas, is a citizen of the State of New York, and resides in Orange County, New York.  He purchased Hydroxycut products, including Hydroxycut Regular Rapid Release Caplets from GNC, Walgreens, and WalMart stores in New York.

19.     Plaintiff, Randi Robinson, is a citizen of the State of Nevada, and resides in Clark County, Nevada.  She purchased Hydroxycut products, including Hydroxycut Regular Rapid Caplets from WalMart and CVS in Las Vegas, Nevada.

20.     Plaintiff, Sharon Stone, is a citizen of the State of Nevada, and resides in Clark County, Nevada.  She purchased Hydroxycut products, including Hydroxycut Regular Rapid Caplets from GNC stores in Henderson, Nevada.

21.     Plaintiff, Mark Sweeney, is a citizen of the State of Nevada, and resides in Clark County, Nevada.  She purchased Hydroxycut products, including Hydroxycut Regular Rapid Caplets from WalMart stores in Las Vegas, Nevada.

22.     Plaintiff, George Ward, is a citizen of the State of Nevada, and resides in Clark County, Nevada.  She purchased Hydroxycut products, including Hydroxycut Regular Rapid Caplets and Hydroxycut Hardcore Liquid Caplets from GNC, WalMart, and Vitamin World stores in Las Vegas, Nevada.

23.     Plaintiff, Barbara Wolff, is a citizen of the State of Nevada, and resides in Clark County, Nevada.  She purchased Hydroxycut products, including Hydroxycut Caffeine-Free Rapid Caplets from Walgreens stores in Henderson, Nevada.

24.     Plaintiff, Pamela Kirkman, is a citizen of the State of North Carolina, and resides in Davidson County, North Carolina.  She purchased Hydroxycut products, including Hydroxycut Hardcore Liquid Caplets and Hydroxycut Max Liquid Caplets from GNC and Vitamin World in North Carolina.

25.     Plaintiff, Dale Pennington, is a citizen of the State of North Carolina, and resides in Hoke County, North Carolina.  He purchased Hydroxycut products, including Hydroxycut Regular Rapid Release Caplets and Hydroxycut Liquid Caplets from supermarket in North Carolina.

26.     Plaintiff, Jimmy Foster, is a citizen of the State of Oregon, and resides in Marion County, Oregaon.  He purchased Hydroxycut products, including Hydroxycut Regular Rapid Release Caplets from Costco and GNC stores in Aurora, Oregon.

27.     Plaintiff, Ryan Mullany, is a citizen of the State of Oregon, and resides in Clackamas County, Oregon.  He purchased Hydroxycut products, including Hydroxycut Hardcore Liquid Caplets and Hydroxycut 24 from GNC stores in Happy Valley, Oregon.

28.     Plaintiff, Brandon Boring, is a citizen of the State of Pennsylvania, and resides in Cambria County, Pennsylvania.  He purchased Hydroxycut products, including Hydroxycut Regular Rapid Release Caplets, Hydroxycut Hardcore Liquid Caplets, and Hydroxycut Liquid Caplets from GNC and a supermarket in Miami, Florida.

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

29.  Plaintiff, Daniel Cobler, Jr., is a citizen of the State of Pennsylvania, and resides in Blair County, Pennsylvania.  He purchased Hydroxycut products, including Hydroxycut Regular Rapid Release Caplets from WalMart stores in Altoona, Pennsylvania.

30.  Plaintiff, Michael Mohr, is a citizen of the State of South Carolina, and resides in Dillon County, South Carolina.  He purchased Hydroxycut products, including Hydroxycut Regular Rapid Release Caplets from WalMart in South Carolina.

31.  Plaintiff, Laurette Johnson, is a citizen of the State of Texas, and resides in Tarrant County, Texas.  She purchased Hydroxycut products, including Hydroxycut Regular Rapid Release Caplets from CVS stores in Ft. Worth, Texas.

32.  Plaintiff, Ronald Thornton, is a citizen of the State of Texas, and resides in Tarrant County, Texas.  He purchased Hydroxycut products, including Hydroxycut Regular Rapid Release Caplets from WalMart stores in Texas.

33.  Plaintiff, Perry Lyons, is a citizen of the State of Virginia, and resides in Grayson County, Virginia.  He purchased Hydroxycut products, including Hydroxycut Hardcore Liquid Caplets from GNC in Virginia.

34.  Plaintiff, Tonia Tibbs, is a citizen of the State of West Virginia, and resides in Mercer County, West Virginia.  She purchased Hydroxycut products, including Hydroxycut Regular Rapid Release Caplets and Hydroxycut Caffeine-Free Rapid Release Caplets from WalMart stores in West Virginia.

35.  Plaintiff, Gregory Bliss, is a citizen of the State of Washington, and resides in Yakima County, Washington.  He purchased Hydroxycut products, including Hydroxycut Max Liquid Caplets from GNC stores in Yakima, Washington.

36.  Plaintiff, Christopher Luft, is a citizen of the State of Washington, and resides in Whitman County, Washington.  He purchased Hydroxycut products, including Hydroxycut Regular Rapid Release Caplets and Hydroxycut 24 from GNC and Costco in Washington.

37.  Plaintiff, Jason Boyd, is a citizen of the State of South Carolina, and resides in York County, South Carolina.  He purchased Hydroxycut products, including Hydroxycut Regular Rapid Release Caplets from GNC stores in Rock Hill, South Carolina.

38.     Plaintiff, Jennifer Fife, is a citizen of the State of Utah, and resides in Weber County, Utah.  She purchased Hydroxycut products, including Hydroxycut Hardcore Liquid Caplets from GNC in South Ogden, Utah.

39.     Plaintiff, Robin Young, is a citizen of the State of Vermont, and resides in Rutland County, Vermont.  She purchased Hydroxycut products, including Hydroxycut Regular Rapid Release Caplets from Rite Aid and a pharmacy in Rutland, Vermont.

40.     Plaintiff, Marcia Homan, is a citizen of the State of Wyoming, and resides in Laramie County, Wyoming.  She purchased Hydroxycut products, including Hydroxycut Hardcore Liquid Caplets from a supermarket in 29 Palms, California.

41.     Defendant, Interhealth Nutraceuticals Incorporated, is a California corporation with headquarters at 5451 Industrial Way, Benicia, California 94510.  At all times relevant hereto, Interhealth Nutraceuticals Incorporated was and is doing business within this judicial district.

42.     Defendant, Iovate Health Sciences, Inc. is a Canadian corporation with headquarters at 381 North Service Road West, Oakville, Ontario L6M OH4.  At all times relevant hereto, Iovate was and is doing business within this judicial district.

43.     Defendant, Iovate Health Sciences Research, Inc. is a Canadian corporation with headquarters at 5100 Spectrum Way, Mississauga, Ontario L4W 5S2.  At all times relevant hereto, Iovate was and is doing business within this judicial district.

44.     Defendant, Iovate Health Sciences Group, Inc. n/k/a Kerr Investment Holding Corp. is a Canadian corporation with headquarters at 5100 Spectrum Way, Mississauga, Ontario L4W 5S2.  At all times relevant hereto, Iovate was and is doing business within this judicial district.

45.     Defendant, Iovate Health Sciences International, Inc. is a Canadian Corporation with headquarters at 5100 Spectrum Way, Mississauga, Ontario L4W 5S2.  At all times relevant hereto, Iovate was and is doing business within this judicial district.

46.     Defendant, Muscletech Research and Development, Inc. is a Canadian corporation with headquarters at 5100 Spectrum Way, Mississauga, Ontario L4W 5S2.  At all times relevant hereto, Muscletech was and is doing business within this judicial district.

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

47.     Defendant, Vitaquest International, LLC is a Delaware corporation with headquarters at 8 Henderson Drive, West Caldwell, New Jersey.  At all times relevant hereto, Vitaquest was and is doing business within this judicial district.

48.     Defendant, Garden State Nutritionals, Inc., is a New Jersey corporation with headquarters at 8 Henderson Drive, West Caldwell, New Jersey.  At all times relevant hereto, Garden State Nutritionals, Inc. was and is doing business within this judicial district.  Upon information and belief, Garden State Nutritionals, Inc. is a wholly owned subsidiary of Vitaquest International, LLC.

49.     Defendant HVL Incorporated is a Delaware corporation with headquarters at 600 Boyce Road, Pittsburgh, Pennsylvania.  At all times relevant hereto, HVL Incorporated was and is doing business within this judicial district.

50.     Defendant HVL LLC is a Delaware corporation with headquarters at 600 Boyce Road, Pittsburgh, Pennsylvania.  At all times relevant hereto, HVL Incorporated was and is doing business within this judicial district.

51.     Defendants INTERHEALTH NEUTRACEUTICALS INCORPORATED; IOVATE HEALTH SCIENCES, INC.; IOVATE HEALTH SCIENCES RESEARCH, INC.; IOVATE HEALTH SCIENCES GROUP, INC. N/K/A KERR INVESTMENT HOLDING CORP; IOVATE HEALTH SCIENCES INTERNATIONAL, INC.; MUSCLETECH RESEARCH AND DEVELOPMENT, INC.; VITAQUEST INTERNATIONAL, LLC; GARDEN STATE NUTRITIONALS, INC.; HVL INCORPORATED; HVL LLC are hereinafter collectively referenced as the "Manufacturing Defendants."

52.     Defendant, GNC Corporation, is a Delaware corporation with headquarters at 300 Sixth Avenue, Pittsburgh, Pennsylvania.  At all times relevant hereto, GNC Corporation was and is doing business within this judicial district.

53.     Defendant, General Nutrition Centers, Inc., is a Delaware corporation with headquarters at 300 Sixth Avenue, Pittsburgh, Pennsylvania.  At all times relevant hereto, General Nutrition Centers, Inc. was and is doing business within this judicial district.

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

54.     Defendant, Wal-Mart Stores, Inc., is a Delaware corporation with headquarters in Bentonville, Arkansas.  At all times relevant hereto, Wal-Mart Stores, Inc. was and is doing business within this judicial district.

55.     Defendant, Rite Aid Corporation, is a Delaware Corporation with headquarters at 30 Hunter Lane, Camp Hill, Pennsylvania. At all times relevant hereto, Rite Aid Corporation was and is doing business within this judicial district.

56.     Defendant, Vitamin World, Inc., is a Delaware Corporation with headquarters at 4320 Veterans Highway, Holbrook, New York.  At all times relevant hereto, Vitamin World, Inc. was and is doing business within this judicial district.

57.     Defendant, Walgreen Co., is an Illinois corporation with its principal place of business located at 200 Wilmot Road, Deerfield, Illinois 60015.  At all times relevant hereto, Walgreen Co. was and is doing business within this judicial district.

58.     Defendant, CVS Caremark Corporation is a Rhode Island corporation with its principal place of business located at One CVS Drive, Woonsocket, Rhode Island.  At all times relevant hereto, CVS was and is doing business within this judicial district.

59.     Defendant Costco Wholesale Corporation is a Washington Corporation with its principal place of business located at 999 Lake Drive, Insaquah, WA.  At all times relevant hereto, Costco was and is doing business within this judicial district.

60.     Defendants GNC CORPORATION; GENERAL NUTRITION CENTERS, INC.; RITE AID CORPORATION; VITAMIN WORLD, INC; WAL-MART STORES, INC.; WALGREENS CO.; CVS CAREMARK CORPORATION; COSTCO WHOLESALE CORPORATION are hereafter collectively referred to as the "Retailer Defendants."

61.     Plaintiff is informed and believes, and thereon alleges, that at all times herein mentioned, that the employees of the Defendants, their subsidiaries, affiliates and other related entities, were the agents, servants and employees of the Defendants, and at all times herein mentioned, each was acting within the purpose and scope of said agency and employment. Whenever referenced in this complaint is made to any act or transaction of any defendant, such allegation shall be deemed to mean that the principals, officers, directors, employees, agents and/or

10

representatives of said defendant committed, knew of, performed, authorized, ratified and/or directed such act or transaction on behalf of said defendant while actively engaged in the scope of their duties.

## **VENUE AND JURISDICTION**

62.     This Court has jurisdiction pursuant to 28 USC §1332, as complete diversity exists between all Plaintiffs and all Defendants and the amount in controversy exceeds $75,000.00, exclusive of interests and costs.

63.     This Court has subject jurisdiction over the controversy because the damages are within the jurisdictional limits of the Court. The Court has *in personam* jurisdiction over Defendants because they have conducted and continue to conduct substantial business in the Eastern District of California.

64.     A substantial part of the events and omissions giving rise to Plaintiffs' causes of action occurred in the Eastern District of California.

65.     Pursuant 28 USC § 1391 (b), venue is proper in the Eastern District of California.

## **FACTS COMMON TO ALL COUNTS**

66.     In response to lobbying efforts of the "dietary supplement" industry, Congress, in 1994, deregulated the industry with the passage of the Dietary Supplement Health and Education Act of 1994, which limited the role of the Food and Drug Administration (FDA).  Dietary supplements grew into a $15 billion a year industry.  Unregulated companies, including the Defendants, manufactured and marketed these products without scientific testing for safety or efficacy.  Nor did the dietary supplement industry maintain comprehensive reporting systems for adverse health events associated with the use of these products.  Consumers are not provided with reliable information either about the benefits or of the risks so that they may reach an informed decision about whether or not to use these products.

67.     Thereafter Defendants and or their predecessor companies were involved in the manufacture, promotion, distribution and sale of various products also using the HYDROXYCUT name that contained dangerous ingredients, including the "herbal" chemical ephedra, which was ultimately banned due to risk of stroke, cardiac events, seizure, rhabdomyolysis, and liver injuries. Many serious events and deaths related thereto were reported, governmental investigations and

reports were issued, a national multidistrict litigation ensued, the predecessor companies filed for bankruptcy due to the liabilities in paying judgments for the many injured and deceased consumers of the ephedra-containing HYDROXYCUT products, and the government was given some regulatory oversight of the "nutraceutical" industry; that oversight was very limited, but did require the manufacturers to report to the FDA adverse reactions to its products.

68.     Thereafter, the Defendants quickly "reformulated" their products by removing the ephedra component and substituting ephedra with other "herbal" products that had comparable "sympathomimetic" or speed-like effects for the purpose of weight loss and "energy boosting."

69.     Defendants once again failed to undertake any meaningful safety studies for these reformulated products, simply using the consumer in the marketplace as their laboratory.

70.     Defendants have promoted, advertised, marketed and sold HYDROXYCUT products throughout the state of Mississippi and elsewhere in the United States.

71.     HYDROXYCUT products are "dietary supplements" marketed for weight loss and energy enhancement that bear the IOVATE or MUSCLETECH brand names.

72.     These HYDROXYCUT products contain a variety of ingredients, as well as numerous proprietary blends such as "Hydroxagen Plus," "Hydroxy Tea," "HydroxyTea CF," "Hydroxycut Proprietary Blend," "Max! Liqui-Burn," "Max! Weight-Loss Matrix," "Hydroxycut Hardcore Proprietary Blend Proxyclene," "Noreidrol Intensity focus Blend," "Lasidrate Delivery Blend," or "Yohimbacore."

73.     Prior to and after May 1, 2009, the FDA received serious adverse health event reports of HYDROXYCUT product users, including users of Hydroxycut Regular Rapid Release Caplets, Hydroxycut Liquid Packs, Hydroxycut Natural, and Hydroxycut Hardcore Liquid Capsules, and Hydroxycut 24, which alleged said products' association with liver complications, including liver failure, cardiovascular complications, rhabdomyolysis, strokes  and other health problems.

74.     An FDA letter dated April 30, 2009 to Iovate Health Sciences, Inc. explained, inpertinent part, that:

> **Conclusion:**
>
> Three lines of evidence derived from multiple disparate sources suggest it is
> very likely that exposure to Hydroxycut capsules/caplets can cause

12

idiosyncratic hepatotoxicity... In addition to Hydroxycut capsules/caplets-associated liver-related adverse effects, CFSAN is aware of a number of CAERS reports that describe seizures, rhabdomyolysis, and cardiovascular signs and symptoms…

***However, based on the totality of evidence presented above, the Agency concludes that the ingestion of the dietary supplement, Hydroxycut, presents a severe potentially life-threatening hazard to some users***. Although Hydroxycut–induced hepatotoxicity has been reversible in most patients that have come to the attention of CFSAN, in certain instances acute liver failure has resulted that has required liver transplantation for survival; death occurred in one instance prior to transplantation…

Given the seriousness of the hazard presented by Hydroxycut, Iovate Health Sciences, Inc. voluntarily agreed to the following:

1. To cease distribution of all existing formulations of Hydroxycut.

2. To recall from the marketplace, to the consumer/user level, all existing formulations of Hydroxycut.

As we stated above, the ingestion of the dietary supplement Hydroxycut presents a severe potentially life-threatening hazard to some users. FDA considers the recalled products to be adulterated under section 402(f)(1)(A) of the Federal Food, Drug, and Cosmetic Act [21 U.S.C. § 342(f) (1)(A)] (the Act) in that the dietary supplements present a significant or unreasonable risk of illness or injury under conditions of use recommended or suggested in labeling.

75.     On May 1, 2009 the FDA announced that consumers should immediately stop using HYDROXYCUT products, including Hydroxycut Regular Rapid Release Caplets, Hydroxycut Liquid Packs, Hydroxycut Natural, and Hydroxycut Hardcore Liquid Capsules, and Hydroxycut 24, because they were associated with these serious health problems.

76.     In connection with the FDA investigation and warning, the following products were recalled:

- ▪ Hydroxycut Regular Rapid Release Caplets
- ▪ Hydroxycut Caffeine-Free Rapid Release Caplets
- ▪ Hydroxycut Hardcore Liquid Caplets
- ▪ Hydroxycut Max Liquid Caplets
- ▪ Hydroxycut Regular Drink Packets
- ▪ Hydroxycut Caffeine-Free Drink Packets
- ▪ Hydroxycut Hardcore Drink Packets (Ignition Stix)
- ▪ Hydroxycut Max Drink Packets
- ▪ Hydroxycut Liquid Packs
- ▪ Hydroxycut Hardcore RTDs (Ready-To-Drink)
- ▪ Hydroxycut Max Aqua Shed
- ▪ Hydroxycut 24
- ▪ Hydroxycut Carb Control

13

■   Hydroxycut Natural

77.     Defendants knew or should have known of HYDROXYCUT products' adverse effects and risks, including such effects and risks of Hydroxycut Regular Rapid Release Caplets, Hydroxycut Liquid Packs, Hydroxycut Natural, and Hydroxycut Hardcore Liquid Capsules, and Hydroxycut 24, but continued to sell massive amounts of said products to maximize their corporate profits and also concealed information they had regarding the dangers of these products.

78.     HYDROXYCUT products were represented to be "America's #1 Selling Weight-Loss Supplement."  In 2008, at least 9 million packages of the products were sold in the United States alone.

79.     Defendants sold HYDROXYCUT products, including Hydroxycut Regular Rapid Release Caplets, Hydroxycut Liquid Packs, Hydroxycut Natural, and Hydroxycut Hardcore Liquid Capsules, and Hydroxycut 24, by misleading users about the products and by failing to adequately warn users of the potential for serious dangers which Defendants knew or should have known might result from consuming said products.  Defendants widely and successfully marketed the products throughout the United States by, among other things, conducting a marketing campaign which misrepresented the efficacy and potential risks of the products in order to induce widespread consumption.

80.     The following representations concerning HYDROXYCUT products were formerly made on a website operated by Defendants: "Plain and simple, Hydroxycut was created to help you reach your weight-loss goals.  This medical doctor-formulated supplement contains ingredients that are of the highest quality and have been combined to make it one of the most effective weight-loss supplements available on the market today.  Hydroxycut is comprised of a blend of research-proven key ingredients that can help you lose up to 4.5 times the weight than diet and exercise alone.  On top of that, this top selling weight-loss supplement increases your energy and helps control you appetite, too.  With Hydroxycut in your diet and exercise plan, you'll be on your way to achieving your weight-loss goals in no time!" http://www.hydroxycut.com/products/hydroxycut/index/shtml.

81.     The HYDROXYCUT product packaging, including that of Hydroxycut Regular Rapid Release Caplets, Hydroxycut Liquid Packs, Hydroxycut Natural, and Hydroxycut Hardcore Liquid

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

Capsules, and Hydroxycut 24, contained numerous misrepresentations concerning the uses and benefits of the products which included, but were not limited to, the following:

      a)    the products were "doctor formulated" and approved, and "Backed by Science";

      b)    the products were of the highest quality and were one of the most effective weight loss supplements available on the market;

      c)    the products contained a blend of research-proven key ingredients that could help consumers lose weight;

      d)    the products contained clinically proven ingredients;

      e)    the products would burn calories.

82.    Without requisite proof, Defendants also claimed that HYDROXYCUT products were "clinically proven" to help consumers "lose weight fast."  For the types of marketing claims at issue, the law requires that the advertiser actually have the level of proof claimed, here clinical proof, at the time the claims were made.  However, Defendants did not have, and have never possessed the requisite level of proof.

83.    For example, in a study commissioned by Iovate, the subjects using Hydroxycut actually lost less weight than the placebo group.  According to Stuart Lowther, Iovate's director of research until 2002, "the bottom line is [that] the majority of products they put on their shelves don't have pure clinical research to support them . . . ."

84.    Published in the March 2005 volume of the journal *Annals of Internal Medicine* is a letter from Drs. Stevens, Qadri and Zein of the Cleveland Clinic Foundation.  The doctors reported that two men presented to their emergency department within a two-month period after ingesting Hydroxycut.  Except for Hydroxycut, which had been taken at the recommended daily doses, the men reported no recent use of herbal or prescription medicines.  Among other symptoms the men, aged 27 and 30, experienced fatigue and jaundice and severe hepatotoxicity.  The doctors concluded that "the lack of evidence for other causes and the temporal relationship of Hydroxycut ingestion to liver injury suggest a causative relationship."  The doctors further stated that the "[e]vidence for the

efficacy of [the Hydroxycut ingredient] *Garcinia cambogia* in promoting weight loss is not compelling."

85.     In the July 2008 volume of the journal *Digestive Diseases and Sciences*, Drs. Sammy Saab and Michael Shim of UCLA Medical School published a case report detailing the story of a 28-year old male who was transferred to their hospital complaining of three weeks of fatigue, dyspnea on exertion, jaundice and dark urine.  In an effort to lose weight the patient had been taking Hydroxycut within the recommended dosing.  The patient's presentation was most consistent with hepatotoxicity associated with Hydroxycut.  The report concluded, "*[t]here is evidence that extracts of Garcinia cambogia, Gymnema sylvestre, and green tea (Camellia sinensis) contained in Hydroxycut may be associated with severe and even fatal hepatotoxicity*."

86.     In the December 2008 volume of the *World Journal of Gastroenterology*, Lily Dara *et al*., "present two patients who experienced severe acute hepatitis in the setting of documented Hydroxycut exposure."  The case series and review states that "[b]oth patients . . . used the dietary supplement Hydroxycut within a short time frame before presenting with acute hepatitis, suggesting Hydroxycut as the most likely etiology for acute liver injury."

87.     In January 2005, doctors at Health Canada reported an incident involving a 47-year-old female who experienced rhabdomyolysis after using Hydroxycut.  The Health Canada officials stated "[i]t is also possible that other ingredients contained in Hydroxycut (Ephedra Free), such as *G. cambogia* (which contains hydroxycitric acid) and chromium picolinate, may play a role in the development of rhabdomyolysis."

88.     Contrary to the marketing and promotional campaign disseminated by Defendants, and contrary to the language on HYDROXYCUT products' labels, including that of Hydroxycut Regular Rapid Release Caplets, Hydroxycut Liquid Packs, Hydroxycut Natural, and Hydroxycut Hardcore Liquid Capsules, and Hydroxycut 24, such products were not a healthy alterative for consumers seeking to increase energy, lose weight, burn calories, or tone muscles.

89.     Instead, HYDROXYCUT products, including Hydroxycut Regular Rapid Release Caplets, Hydroxycut Liquid Packs, Hydroxycut Natural, and Hydroxycut Hardcore Liquid Capsules, and Hydroxycut 24, were unsafe and unfit for human consumption, in that they could cause serious

injury and death, side effects which were neither warned of on the product packaging nor mentioned in the advertising or promotional materials Defendants created to persuade consumers to purchase the products.

90.     Defendants' advertising, marketing and promotion of HYDROXYCUT products, including Hydroxycut Regular Rapid Release Caplets, Hydroxycut Liquid Packs, Hydroxycut Natural, and Hydroxycut Hardcore Liquid Capsules, and Hydroxycut 24,, were deceptive and misleading in that they concealed the risks of liver complications, cardiovascular disorders, which necessarily includes strokes, rhabdomyolysis, kidney failure and other serious health risks of which the Defendants knew or should have known.

91.     Upon information and belief, the ingredients listed on HYDROXYCUT products, including Hydroxycut Regular Rapid Release Caplets, Hydroxycut Liquid Packs, Hydroxycut Natural, and Hydroxycut Hardcore Liquid Capsules, and Hydroxycut 24,  packaging, labels, advertising and promotions did not conform to the Defendants' specifications regarding the quantities and substances.

92.     No clinical trials were ever performed for the actual HYDROXYCUT products that were marketed, including Hydroxycut Regular Rapid Release Caplets, Hydroxycut Liquid Packs, Hydroxycut Natural, and Hydroxycut Hardcore Liquid Capsules, and Hydroxycut 24,.

93.     Defendants misleadingly suggested to consumers through HYDROXYCUT product packaging, labels, advertising and promotions, including those Hydroxycut Regular Rapid Release Caplets, Hydroxycut Liquid Packs, Hydroxycut Natural, and Hydroxycut Hardcore Liquid Capsules, and Hydroxycut 24, that double blind placebo controlled studies were conducted of said products, but the actual clinical trials were for allegedly "key ingredients" and not the HYDROXYCUT products marketed by Defendants and purchased and consumed by the Plaintiffs.

94.     Defendants, VITAQUEST INTERNATIONAL, LLC, GARDEN STATE NUTRITIONAL, INC., HVL INCORPORATED, HVL LLC, and INTERHEALTH NEUTRACEUTICALS INCORPORATED, as a part of each Defendant's business, manufactured, formulated, and/or packaged HYDROXYCUT products and the ingredients therein, including Hydroxycut Regular Rapid Release Caplets, Hydroxycut Liquid Packs, Hydroxycut Natural, and

1  Hydroxycut Hardcore Liquid Capsules, and Hydroxycut 24, as contractors to IOVATE HEALTH

2  SCIENCES INC., IOVATE HEALTH SCIENCES GROUP, INC., n/k/a KERR INVESTMENT

3  HOLDING CORP. IOVATE HEALTH SCIENCES RESEARCH, INC., IOVATE HEALTH

4  SCIENCES INTERNATIONAL, INC. and MUSCLETECH RESEARCH AND DEVELOPMENT,

5  INC.

6       95.    VITAQUEST INTERNATIONAL, LLC, GARDEN STATE NUTRITIONAL, INC.,

7  HVL INCORPORATED, HVL LLC, and INTERHEALTH NUTRACEUTICALS, INC. were

8  responsible for selecting the supplier of ingredients that they later used to manufacture, produce,

9  formulate, and/or package Hydroxycut Products and the ingredients therein.

10       96.    VITAQUEST INTERNATIONAL, LLC, GARDEN STATE NUTRITIONAL, INC.,

11  HVL INCORPORATED, HVL LLC, and INTERHEALTH NUTRACEUTICALS

12  INCORPORATED were responsible for researching and testing the safety and efficacy of ingredients

13  they used to manufacture and produce Hydroxycut products and the ingredients therein.

14       97.    In addition to manufacturing, producing, formulating, and packaging Hydroxycut

15  Products, VITAQUEST INTERNATIONAL, LLC, GARDEN STATE NUTRITIONAL, INC., HVL

16  INCORPORATED, HVL LLC, and INTERHEALTH NUTRACEUTICALS INCOROPRATED sold

17  these products and ingredients therein to IOVATE HEALTH SCIENCES INC., IOVATE HEALTH

18  SCIENCES GROUP, INC., n/k/a KERR INVESTMENT HOLDING CORP., IOVATE HEALTH

19  SCIENCES RESEARCH, INC., IOVATE HEALTH SCIENCES INTERNATIONAL, INC. and

20  MUSCLETECH RESEARCH AND DEVELOPMENT, INC.

21       98.    In manufacturing, producing, formulating, and packaging Hydroxycut products for

22  and selling Hydroxycut Products and ingredients therein to IOVATE HEALTH SCIENCES INC.,

23  IOVATE HEALTH SCIENCES GROUP, INC., n/k/a KERR INVESTMENT HOLDING CORP.

24  IOVATE HEALTH SCIENCES RESEARCH, INC., IOVATE HEALTH SCIENCES

25  INTERNATIONAL, INC. and MUSCLETECH RESEARCH AND DEVELOPMENT, INC., the

26  contract manufacturing defendants VITAQUEST INTERNATIONAL, LLC, GARDEN STATE

27  NUTRITIONAL, INC., HVL INCORPORATED, HVL LLC, and INTERHEALTH

28  NUTRACEUTICALS INCORPORATED adopted and consented to, and as a result became

18

responsible for, all representations made on Hydroxycut Products' packaging and representations made by the Iovate defendants regarding the safety and efficacy of the Hydroxycut Products.  These contract manufacturing defendants knew that these products would be sold to consumers and that these consumers would rely on the representations made on the products' packaging and by the Iovate defendants.

99.   Defendants, GNC Corporation, General Nutrition Centers, Inc., Rite Aid Corporation, and Vitamin Shoppe as a part of each Defendant's business, sold HYDROXYCUT products, including Hydroxycut Regular Rapid Release Caplets, Hydroxycut Liquid Packs, Hydroxycut Natural, and Hydroxycut Hardcore Liquid Capsules, and Hydroxycut 24, in their retail stores.

100.   During the years 2004 through 2007, as a result of claims made by Defendants regarding the safety and effectiveness of the HYDROXYCUT products, plaintiff Mark Aguilar purchased HYDROXYCUT products, including Hydroxycut products, including Hydroxycut Regular Rapid Release Caplets, Hydroxycut Caffeine-Free Rapid Release Caplets, Hydroxycut Hardcore Liquid Caplets, Hydroxycut Max Liquid Caplets,  Hydroxycut Regular Drink Packets, Hydroxycut Caffeine-Free Drink Packets, Hydroxycut Hardcore Drink Packets, Hydroxycut Max Drink Packets, Hydroxycut Liquid Shots, Hydroxycut Hardcore RTDs, Hydroxycut Max Aqua Shed, Hydroxycut 24, Hydroxycut Carb Control, and Hydroxycut Natural to burn fat and for energy enhancement.

101.   Prior to consuming HYDROXYCUT products, Plaintiff Mark Aguilar read the package label.  Upon information and belief, at all relevant times, Plaintiff Mark Aguilar ingested HYDROXYCUT products as recommended doses and in the manner contemplated by Defendants.

102.   In 2008, Plaintiff, Mark Aguilar, was diagnosed with various liver complications, including liver disease, and rhabdomyolysis with kidney failure by Dr. Julia Caldwell in Carlsbad, New Mexico and received medical treatment from that facility.

103.   In 2008, Plaintiff, Mark Aguilar, was diagnosed with various heart complications, including Myocardial Infarction by Dr. Elizabeth Madison in Carlsbad, New Mexico and received medical treatment from that facility.

104.   During the year 2009, as a result of claims made by Defendants regarding the safety and effectiveness of the HYDROXYCUT products, plaintiff Lorraine Nelson purchased

19

HYDROXYCUT products, including Hydroxycut Regular Drink Packets to burn fat and for energy enhancement.

105.    Prior to consuming HYDROXYCUT products, Plaintiff Lorraine Nelson read the package label.  Upon information and belief, at all relevant times, Plaintiff Lorraine Nelson ingested HYDROXYCUT products as recommended doses and in the manner contemplated by Defendants.

106.    In 2011, Plaintiff, Lorraine Nelson, was diagnosed with various heart complications by Family Physicians of Windsor in Windsor, Colorado and received medical treatment from that facility.

107.    During the years 2008 and 2009, as a result of claims made by Defendants regarding the safety and effectiveness of the HYDROXYCUT products, plaintiff Jeffrey Dieguez purchased HYDROXYCUT products, including Hydroxycut Regular Rapid Release Caplets to burn fat and for energy enhancement.

108.    Prior to consuming HYDROXYCUT products, Plaintiff Jeffrey Dieguez read the package label.  Upon information and belief, at all relevant times, Plaintiff Jeffrey Dieguez ingested HYDROXYCUT products as recommended doses and in the manner contemplated by Defendants.

109.    In April, 2009, Plaintiff, Jeffrey Dieguez, was diagnosed with various kidney complications, including kidney failure by Cape Canaveral Hospital in Cocoa Beach, Florida and received medical treatment from that facility.

110.    During the years 2001 through 2005, as a result of claims made by Defendants regarding the safety and effectiveness of the HYDROXYCUT products, plaintiff Harry Williams purchased HYDROXYCUT products, including Hydroxycut Regular Rapid Release Caplets, Hydroxycut Hardcore Drink Packets, and Hydroxycut Natural to burn fat and for energy enhancement.

111.    Prior to consuming HYDROXYCUT products, Plaintiff Harry Williams read the package label.  Upon information and belief, at all relevant times, Plaintiff Harry Williams ingested HYDROXYCUT products as recommended doses and in the manner contemplated by Defendants.

112.     In 2002, Plaintiff, Harry Williams, was diagnosed with various liver complications, including elevated liver enzymes by the VA Hospital in Tamarac, Florida and received medical treatment from that facility.

113.     During the year 2004, as a result of claims made by Defendants regarding the safety and effectiveness of the HYDROXYCUT products, plaintiff Sarah Young Hopes purchased HYDROXYCUT products, including Hydroxycut Regular Rapid Release Caplets, Hydroxycut Hardcore Liquid Caplets, and Hydroxycut Max Liquid Caplets to burn fat and for energy enhancement.

114.     Prior to consuming HYDROXYCUT products, Plaintiff Sarah Young Hopes read the package label.  Upon information and belief, at all relevant times, Plaintiff Sarah Young Hopes ingested HYDROXYCUT products as recommended doses and in the manner contemplated by Defendants.

115.     In 2004, Plaintiff, Sarah Young Hopes, was diagnosed with seizures by Charlotte Regional Medical Center in Punta Gorda, Florida and received medical treatment from that facility.

116.     During the years 2004 through 2008, as a result of claims made by Defendants regarding the safety and effectiveness of the HYDROXYCUT products, plaintiff Howard Herring purchased HYDROXYCUT products, including Hydroxycut Hardcore Liquid Caplets and Hydroxycut Hardcore Drink Packets to burn fat and for energy enhancement.

117.     Prior to consuming HYDROXYCUT products, Plaintiff Howard Herring read the package label.  Upon information and belief, at all relevant times, Plaintiff Howard Herring ingested HYDROXYCUT products as recommended doses and in the manner contemplated by Defendants.

118.     Plaintiff, Howard Herring, has diagnosed with various heart complications, including irregular heartbeat.

119.     During the years 2006 through 2009, as a result of claims made by Defendants regarding the safety and effectiveness of the HYDROXYCUT products, plaintiff Tiffany Jackson purchased HYDROXYCUT products, including Hydroxycut Regular Rapid Release Caplets and Hydroxycut Caffeine-Free Rapid Release Caplets to burn fat and for energy enhancement.

120.     Prior to consuming HYDROXYCUT products, Plaintiff Tiffany Jackson read the package label.  Upon information and belief, at all relevant times, Plaintiff Tiffany Jackson ingested HYDROXYCUT products as recommended doses and in the manner contemplated by Defendants.

121.     In May, 2008, Plaintiff, Tiffany Jackson, was diagnosed with various liver complications, including elevated liver enzymes by Dr. Zaigham Butt in Athens, Georgia and received medical treatment from that facility.

122.     During the years 2000 through 2006, as a result of claims made by Defendants regarding the safety and effectiveness of the HYDROXYCUT products, plaintiff Jacqueline Templeton purchased HYDROXYCUT products, including Hydroxycut Regular Rapid Release Caplets, Hydroxycut Hardcore Liquid Caplets, Hydroxycut Liquid Sots and Hydroxycut Natural to burn fat and for energy enhancement.

123.     Prior to consuming HYDROXYCUT products, Plaintiff Jacqueline Templeton read the package label.  Upon information and belief, at all relevant times, Plaintiff Jacqueline Templeton ingested HYDROXYCUT products as recommended doses and in the manner contemplated by Defendants.

124.     Plaintiff, Jacqueline Templeton, was diagnosed with Seizures, muscle damage, various liver complications, including elevated liver enzymes, and various heart complications by St. Joseph Hospital in Atlanta, Georgia and received medical treatment from that facility.

125.     During the years 2007 and 2008, as a result of claims made by Defendants regarding the safety and effectiveness of the HYDROXYCUT products, plaintiff Alene Fair purchased HYDROXYCUT products, including Hydroxycut Regular Rapid Release Caplets to burn fat and for energy enhancement.

126.     Prior to consuming HYDROXYCUT products, Plaintiff Alene Fair read the package label.  Upon information and belief, at all relevant times, Plaintiff Alene Fair ingested HYDROXYCUT products as recommended doses and in the manner contemplated by Defendants.

127.     In July, 2009, Plaintiff, Alene Fair, was diagnosed with various heart complications, including myocardial infarction by Mercy Medical Center in Nampa, Idaho and received medical treatment from that facility.

128.     During the years 2002 through 2009, as a result of claims made by Defendants regarding the safety and effectiveness of the HYDROXYCUT products, plaintiff Mark Paul Rodery purchased HYDROXYCUT products, including Hydroxycut Regular Rapid Release Caplets and Hydroxycut Regular Drink Packets to burn fat and for energy enhancement.

129.     Prior to consuming HYDROXYCUT products, Plaintiff Mark Paul read the package label.  Upon information and belief, at all relevant times, Plaintiff Mark Paul ingested HYDROXYCUT products as recommended doses and in the manner contemplated by Defendants.

130.     In 2004, Plaintiff, Mark Paul, was diagnosed with various liver complications, including elevated liver enzymes by DRD Medical Clinic in New Orleans, Louisiana and received medical treatment from that facility.

131.     During the years 2009 and 2010, as a result of claims made by Defendants regarding the safety and effectiveness of the HYDROXYCUT products, plaintiff Mark Paul purchased HYDROXYCUT products, including Hydroxycut Hardcore Liquid Caplets to burn fat and for energy enhancement.

132.     Prior to consuming HYDROXYCUT products, Plaintiff Mark Paul read the package label.  Upon information and belief, at all relevant times, Plaintiff Mark Paul ingested HYDROXYCUT products as recommended doses and in the manner contemplated by Defendants.

133.     In 2009, Plaintiff, Mark Paul, was diagnosed with various liver complications, including elevated liver enzymes by Bayne Jones Army Community Hospital in Ft. Polk, Louisiana and received medical treatment from that facility.

134.     During the year 2008, as a result of claims made by Defendants regarding the safety and effectiveness of the HYDROXYCUT products, plaintiff Latanna Thompson purchased HYDROXYCUT products, including Hydroxycut Regular Rapid Release Caplets to burn fat and for energy enhancement.

135.     Prior to consuming HYDROXYCUT products, Plaintiff Latanna Thompson read the package label.  Upon information and belief, at all relevant times, Plaintiff Latanna Thompson ingested HYDROXYCUT products as recommended doses and in the manner contemplated by Defendants.

136.    In 2008, Plaintiff, Latanna Thompson, was diagnosed with various kidney complications, including renal failure by Three Rivers Health in Three Rivers, Michigan and received medical treatment from that facility.

137.    During the years 2008 and 2009, as a result of claims made by Defendants regarding the safety and effectiveness of the HYDROXYCUT products, plaintiff Amber Casper Rodery purchased HYDROXYCUT products, including Hydroxycut Caffeine-Free Rapid Release Caplets to burn fat and for energy enhancement.

138.    Prior to consuming HYDROXYCUT products, Plaintiff Amber Casper Rodery read the package label.  Upon information and belief, at all relevant times, Plaintiff Amber Casper Rodery ingested HYDROXYCUT products as recommended doses and in the manner contemplated by Defendants.

139.    In January, 2009, Plaintiff, Amber Casper Rodery, was diagnosed with various liver complications, including jaundice as well as kidney infections by Dr. Stephen Hawkins in Cabool, Missouri and received medical treatment from that facility.

140.    Prior to 2009, as a result of claims made by Defendants regarding the safety and effectiveness of the HYDROXYCUT products, plaintiff Joseph Pace purchased HYDROXYCUT products, including Hydroxycut Regular Rapid Release Caplets to burn fat and for energy enhancement.

141.    Prior to consuming HYDROXYCUT products, Plaintiff Joseph Pace read the package label.  Upon information and belief, at all relevant times, Plaintiff Joseph Pace ingested HYDROXYCUT products as recommended doses and in the manner contemplated by Defendants.

142.    In 2011, Plaintiff, Joseph Pace, was diagnosed with various kidney complications, by Encompass Medical Group in Independence, Missouri and received medical treatment from that facility.

143.    During the years 2006 and 2010, as a result of claims made by Defendants regarding the safety and effectiveness of the HYDROXYCUT products, plaintiff Ashley Clayton purchased HYDROXYCUT products, including Hydroxycut Regular Rapid Release Caplets and Hydroxycut Caffeine-Free Rapid Release Caplets to burn fat and for energy enhancement.

144.    Prior to consuming HYDROXYCUT products, Plaintiff Ashley Clayton read the package label.  Upon information and belief, at all relevant times, Plaintiff Ashley Clayton ingested HYDROXYCUT products as recommended doses and in the manner contemplated by Defendants.

145.    In 2010 and 2011, Plaintiff, Ashley Clayton, was diagnosed with various heart complications by Family Medical Center and Bolivar Medical Center in Cleveland, Mississippi and received medical treatment from that facility.

146.    During the years 2008 and 2009, as a result of claims made by Defendants regarding the safety and effectiveness of the HYDROXYCUT products, plaintiff John Lockett purchased HYDROXYCUT products, including Hydroxycut Hardcore Liquid Caplets to burn fat and for energy enhancement.

147.    Prior to consuming HYDROXYCUT products, Plaintiff John Lockett read the package label.  Upon information and belief, at all relevant times, Plaintiff John Lockett ingested HYDROXYCUT products as recommended doses and in the manner contemplated by Defendants.

148.    Plaintiff, John Lockett, was diagnosed with various heart complications by Dr. Martin Harvey in Collins, Mississippi and received medical treatment from that facility.

149.    During the years prior to 2009, as a result of claims made by Defendants regarding the safety and effectiveness of the HYDROXYCUT products, plaintiff Kenneth Leonas purchased HYDROXYCUT products, including Hydroxycut Regular Rapid Release Caplets to burn fat and for energy enhancement.

150.    Prior to consuming HYDROXYCUT products, Plaintiff Kenneth Leonas read the package label.  Upon information and belief, at all relevant times, Plaintiff Kenneth Leonas ingested HYDROXYCUT products as recommended doses and in the manner contemplated by Defendants.

151.    In 2008, Plaintiff, Kenneth Leonas, was diagnosed with various heart complications by New York Presbyterian Hospital in New York, New York and received medical treatment from that facility.

152.    During the years 2007 through 2009, as a result of claims made by Defendants regarding the safety and effectiveness of the HYDROXYCUT products, plaintiff Randi Robinson

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

1  purchased HYDROXYCUT products, including Hydroxycut Regular Rapid Release Caplets to burn
2  fat and for energy enhancement.

3       153.    Prior to consuming HYDROXYCUT products, Plaintiff Randi Robinson read the
4  package label.  Upon information and belief, at all relevant times, Plaintiff Randi Robinson ingested
5  HYDROXYCUT products as recommended doses and in the manner contemplated by Defendants.

6       154.    In 2007, Plaintiff, Randi Robinson, was diagnosed with various liver complications by
7  Dr. Dennis Lemon in Las Vegas, Nevada and received medical treatment from that facility.

8       155.    During the year 2009, as a result of claims made by Defendants regarding the safety
9  and effectiveness of the HYDROXYCUT products, plaintiff Sharon Stone purchased
10 HYDROXYCUT products, including Hydroxycut Regular Rapid Release Caplets to burn fat and for
11 energy enhancement.

12      156.    Prior to consuming HYDROXYCUT products, Plaintiff Sharon Stone read the
13 package label.  Upon information and belief, at all relevant times, Plaintiff Sharon Stone ingested
14 HYDROXYCUT products as recommended doses and in the manner contemplated by Defendants.

15      157.    Plaintiff, Sharon Stone, was diagnosed with various liver complications, including
16 elevated liver enzymes by Dr. Badar Anwar in Henderson, Nevada and received medical treatment
17 from that facility.

18      158.    During the years 2001 through 2007, as a result of claims made by Defendants
19 regarding the safety and effectiveness of the HYDROXYCUT products, plaintiff Mark Sweeney
20 purchased HYDROXYCUT products, including Hydroxycut Regular Rapid Release Caplets to burn
21 fat and for energy enhancement.

22      159.    Prior to consuming HYDROXYCUT products, Plaintiff Mark Sweeney read the
23 package label.  Upon information and belief, at all relevant times, Plaintiff Mark Sweeney ingested
24 HYDROXYCUT products as recommended doses and in the manner contemplated by Defendants.

25      160.    In 2008, Plaintiff, Mark Sweeney, was diagnosed with seizures by VA Southern
26 Nevada in Henderson, Nevada and received medical treatment from that facility.

27      161.    During the year 2000, as a result of claims made by Defendants regarding the safety
28 and effectiveness of the HYDROXYCUT products, plaintiff George Ward purchased

1  HYDROXYCUT products, including Hydroxycut Regular Rapid Release Caplets and Hydroxycut

2  Hardcore Liquid Caplets to burn fat and for energy enhancement.

3         162.    Prior to consuming HYDROXYCUT products, Plaintiff George Ward read the

4  package label.  Upon information and belief, at all relevant times, Plaintiff George Ward ingested

5  HYDROXYCUT products as recommended doses and in the manner contemplated by Defendants.

6         163.    Plaintiff, George Ward, was diagnosed with various kidney and liver conditions,

7  including elevated liver enzymes, and kidney failureby Dr. David Wichman in Las Vegas, Nevada

8  and received medical treatment from that facility.

9         164.    During the year 2008, as a result of claims made by Defendants regarding the safety

10  and effectiveness of the HYDROXYCUT products, plaintiff Barbara Wolff purchased

11  HYDROXYCUT products, including Hydroxycut Caffeine-Free Rapid Release Caplets to burn fat

12  and for energy enhancement.

13         165.    Prior to consuming HYDROXYCUT products, Plaintiff Barbara Wolff read the

14  package label.  Upon information and belief, at all relevant times, Plaintiff Barbara Wolff ingested

15  HYDROXYCUT products as recommended doses and in the manner contemplated by Defendants.

16         166.    In 2008, Plaintiff, Barbara Wolff, was diagnosed with various heart complications by

17  Dr. Kamboj in Las Vegas, Nevada and received medical treatment from that facility.

18         167.    In 2009, Plaintiff, Barbara Wolff, was diagnosed with various seizures by Dr.

19  Goodman in Las Vegas, Nevada and received medical treatment from that facility.

20         168.    During the years 2006 through 2009, as a result of claims made by Defendants

21  regarding the safety and effectiveness of the HYDROXYCUT products, plaintiff Pamela Kirkman

22  purchased HYDROXYCUT products, including Hydroxycut Hardcore Liquid Caplets and

23  Hydroxycut Max Liquid Caplets to burn fat and for energy enhancement.

24         169.    Prior to consuming HYDROXYCUT products, Plaintiff Pamela Kirkman read the

25  package label.  Upon information and belief, at all relevant times, Plaintiff Pamela Kirkman ingested

26  HYDROXYCUT products as recommended doses and in the manner contemplated by Defendants.

27

28

170.     In 2008, Plaintiff, Pamela Kirkman, was diagnosed with various heart complications by Carolina Cardiology and High Point Regional Medical Center in High Point, North Carolina and received medical treatment from that facility.

171.     During the years 2007 and 2008, as a result of claims made by Defendants regarding the safety and effectiveness of the HYDROXYCUT products, plaintiff Dale Pennington purchased HYDROXYCUT products, including Hydroxycut Regular Rapid Release Caplets and Hydroxycut Liquid Caplets to burn fat and for energy enhancement.

172.     Prior to consuming HYDROXYCUT products, Plaintiff Dale Pennington read the package label.  Upon information and belief, at all relevant times, Plaintiff Dale Pennington ingested HYDROXYCUT products as recommended doses and in the manner contemplated by Defendants.

173.     In 2009, Plaintiff, Dale Pennington, was diagnosed with seizures and various heart complications, including myocardial infarction by Womack Army Medical Center in Ft. Bragg, North Carolina and received medical treatment from that facility.

174.     During the years 2006 through 2008, as a result of claims made by Defendants regarding the safety and effectiveness of the HYDROXYCUT products, plaintiff Jimmy Foster purchased HYDROXYCUT products, including Hydroxycut Regular Rapid Release Caplets to burn fat and for energy enhancement.

175.     Prior to consuming HYDROXYCUT products, Plaintiff Jimmy Foster read the package label.  Upon information and belief, at all relevant times, Plaintiff Jimmy Foster ingested HYDROXYCUT products as recommended doses and in the manner contemplated by Defendants.

176.     In October, 2008, Plaintiff, Jimmy Foster, was diagnosed with Seizures by Meridian Park Hospital in Tualatin, Oregon and received medical treatment from that facility.

177.     In March, 2007, Plaintiff, Jimmy Foster, was diagnosed with various kidney complications by Silverton Hospital in Silverton, Oregon and received medical treatment from that facility.

178.     During the years 2007 and 2008, as a result of claims made by Defendants regarding the safety and effectiveness of the HYDROXYCUT products, plaintiff Ryan Mullany purchased

1  HYDROXYCUT products, including Hydroxycut Hardcore Liquid Caplets and Hydroxycut 24 to

2  burn fat and for energy enhancement.

3       179.   Prior to consuming HYDROXYCUT products, Plaintiff Ryan Mullany read the

4  package label.  Upon information and belief, at all relevant times, Plaintiff Ryan Mullany ingested

5  HYDROXYCUT products as recommended doses and in the manner contemplated by Defendants.

6       180.   In 2008, Plaintiff, Ryan Mullany, was diagnosed with various kidney complications by

7  Providence Portland Medical Center in Portland, Oregon and received medical treatment from that

8  facility.

9       181.   During the years 2002 through 2006, as a result of claims made by Defendants

10  regarding the safety and effectiveness of the HYDROXYCUT products, plaintiff Brandon Boring

11  purchased HYDROXYCUT products, including Hydroxycut Regular Rapid Release Caplets,

12  Hydroxycut Hardcore Liquid Caplets, and Hydroxycut Liquid Caplets to burn fat and for energy

13  enhancement.

14       182.   Prior to consuming HYDROXYCUT products, Plaintiff Brandon Boring read the

15  package label.  Upon information and belief, at all relevant times, Plaintiff Brandon Boring ingested

16  HYDROXYCUT products as recommended doses and in the manner contemplated by Defendants.

17       183.   In 2010, Plaintiff, Brandon Boring, was diagnosed with Seizures by John P. Murtha

18  and Neuroscience and Pain Institute in Johnstown, Pennsylvania and received medical treatment from

19  that facility.

20       184.   During the years 2007 and 2008, as a result of claims made by Defendants regarding

21  the safety and effectiveness of the HYDROXYCUT products, plaintiff Daniel Cobler, Jr. purchased

22  HYDROXYCUT products, including Hydroxycut Regular Rapid Release Caplets to burn fat and for

23  energy enhancement.

24       185.   Prior to consuming HYDROXYCUT products, Plaintiff Daniel Cobler, Jr. read the

25  package label.  Upon information and belief, at all relevant times, Plaintiff Daniel Cobler, Jr. ingested

26  HYDROXYCUT products as recommended doses and in the manner contemplated by Defendants.

27       186.   In June, 2008, Plaintiff, Daniel Cobler, Jr., was diagnosed with Seizures by Blair

28  Medical Associates in Altoona, Pennsylvania and received medical treatment from that facility.

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

187.    In 2010, Plaintiff, Michael Mohr, was diagnosed with various liver complications, including elevated liver enzymes by McCleod Medical Center in Dillon, South Carolina and received medical treatment from that facility

188.    During the year 2009, as a result of claims made by Defendants regarding the safety and effectiveness of the HYDROXYCUT products, plaintiff Michael Mohr purchased HYDROXYCUT products, including Hydroxycut Regular Rapid Release Caplets to burn fat and for energy enhancement.

189.    Prior to consuming HYDROXYCUT products, Plaintiff Michael Mohr read the package label.  Upon information and belief, at all relevant times, Plaintiff Michael Mohr ingested HYDROXYCUT products as recommended doses and in the manner contemplated by Defendants.

190.    During the year 2009, as a result of claims made by Defendants regarding the safety and effectiveness of the HYDROXYCUT products, plaintiff Laurette Johnson purchased HYDROXYCUT products, including Hydroxycut Regular Rapid Release Caplets to burn fat and for energy enhancement.

191.    Prior to consuming HYDROXYCUT products, Plaintiff Laurette Johnson read the package label.  Upon information and belief, at all relevant times, Plaintiff Laurette Johnson ingested HYDROXYCUT products as recommended doses and in the manner contemplated by Defendants.

192.    In May, 2009, Plaintiff, Laurette Johnson, was diagnosed with Seizures by JPS Women's Health Clinic in Ft. Worth, Texas and received medical treatment from that facility.

193.    During the year 2005, as a result of claims made by Defendants regarding the safety and effectiveness of the HYDROXYCUT products, plaintiff Ronald Thornton purchased HYDROXYCUT products, including Hydroxycut Regular Rapid Release Caplets to burn fat and for energy enhancement.

194.    Prior to consuming HYDROXYCUT products, Plaintiff Ronald Thornton read the package label.  Upon information and belief, at all relevant times, Plaintiff Ronald Thornton ingested HYDROXYCUT products as recommended doses and in the manner contemplated by Defendants.

195.    In 2005, Plaintiff, Ronald Thornton, was diagnosed with Seizures by Harris Hospital in Ft. Worth, Texas and received medical treatment from that facility.

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

196.    During the year 2008, as a result of claims made by Defendants regarding the safety and effectiveness of the HYDROXYCUT products, plaintiff Perry Lyons purchased HYDROXYCUT products, including Hydroxycut Hardcore Liquid Caplets to burn fat and for energy enhancement.

197.    Prior to consuming HYDROXYCUT products, Plaintiff Perry Lyons read the package label.  Upon information and belief, at all relevant times, Plaintiff Perry Lyons ingested HYDROXYCUT products as recommended doses and in the manner contemplated by Defendants.

198.    In 2008, Plaintiff, Perry Lyons, was diagnosed with seizures by Twin County Regional Hospital in Galax, Virginia and received medical treatment from that facility.

199.    During the years 2001 through 2009, as a result of claims made by Defendants regarding the safety and effectiveness of the HYDROXYCUT products, plaintiff Tonia Tibbs purchased HYDROXYCUT products, including Hydroxycut Regular Rapid Release Caplets and Hydroxycut Caffeine-Free Rapid Release Caplets to burn fat and for energy enhancement.

200.    Prior to consuming HYDROXYCUT products, Plaintiff Tonia Tibbs read the package label.  Upon information and belief, at all relevant times, Plaintiff Tonia Tibbs ingested HYDROXYCUT products as recommended doses and in the manner contemplated by Defendants.

201.    Plaintiff, Tonia Tibbs, was diagnosed with various kidney complications insufficiency by Dr. William King in Christiansberg, Virginia and received medical treatment from that facility.

202.    During the year 2007, as a result of claims made by Defendants regarding the safety and effectiveness of the HYDROXYCUT products, plaintiff Gregory Bliss purchased HYDROXYCUT products, including Hydroxycut Max Liquid Caplets to burn fat and for energy enhancement.

203.    Prior to consuming HYDROXYCUT products, Plaintiff Gregory Bliss read the package label.  Upon information and belief, at all relevant times, Plaintiff Gregory Bliss ingested HYDROXYCUT products as recommended doses and in the manner contemplated by Defendants.

204.    In 2008 and 2009, Plaintiff, Gregory Bliss, was diagnosed with various heart complications by Indian Health Services in Toppenish, Washington and received medical treatment from that facility.

205.    During the years 2007 through 2009, as a result of claims made by Defendants regarding the safety and effectiveness of the HYDROXYCUT products, plaintiff Christopher Luft purchased HYDROXYCUT products, including Hydroxycut Regular Rapid Release Caplets and Hydroxycut 24 to burn fat and for energy enhancement.

206.    Prior to consuming HYDROXYCUT products, Plaintiff Christopher Luft read the package label.  Upon information and belief, at all relevant times, Plaintiff Christopher Luft ingested HYDROXYCUT products as recommended doses and in the manner contemplated by Defendants.

207.    In May, 2008, Plaintiff, Christopher Luft, was diagnosed with various liver complications, including elevated liver enzymes and "fatty liver" by Whitman Medical Group in Colfax, Washington and received medical treatment from that facility.

208.    During the year 2008, as a result of claims made by Defendants regarding the safety and effectiveness of the HYDROXYCUT products, plaintiff Jason Boyd purchased HYDROXYCUT products, including Hydroxycut Regular Rapid Release Caplets to burn fat and for energy enhancement.

209.    Prior to consuming HYDROXYCUT products, Plaintiff Jason Boyd read the package label.  Upon information and belief, at all relevant times, Plaintiff Jason Boyd ingested HYDROXYCUT products as recommended doses and in the manner contemplated by Defendants.

210.    In November, 2008, Plaintiff, Jason Boyd, was diagnosed with seizures by Richland Memorial in Columbia, South Carolina and received medical treatment from that facility.

211.    During the year 2008, as a result of claims made by Defendants regarding the safety and effectiveness of the HYDROXYCUT products, plaintiff Jennifer Fife purchased HYDROXYCUT products, including Hydroxycut Hardcore Liquid Caplets to burn fat and for energy enhancement.

212.    Prior to consuming HYDROXYCUT products, Plaintiff Jennifer Fife read the package label.  Upon information and belief, at all relevant times, Plaintiff Jennifer Fife ingested HYDROXYCUT products as recommended doses and in the manner contemplated by Defendants.

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

213.    In May, 2008, Plaintiff, Jennifer Fife, was diagnosed with various heart complications, including supraventricular tachycardia by McKay Dee Hospital in Ogden, Utah and received medical treatment from that facility.

214.    During the years 2007 and 2008, as a result of claims made by Defendants regarding the safety and effectiveness of the HYDROXYCUT products, plaintiff Robin Young purchased HYDROXYCUT products, including Hydroxycut Regular Rapid Release Caplets to burn fat and for energy enhancement.

215.    Prior to consuming HYDROXYCUT products, Plaintiff Robin Young read the package label.  Upon information and belief, at all relevant times, Plaintiff Robin Young ingested HYDROXYCUT products as recommended doses and in the manner contemplated by Defendants.

216.    In 2008, Plaintiff, Robin Young, was diagnosed with various heart complications by Center for Integrative Medicine in Rutland, Vermont and received medical treatment from that facility.

217.    During the year 2009, as a result of claims made by Defendants regarding the safety and effectiveness of the HYDROXYCUT products, plaintiff Marcia Homan purchased HYDROXYCUT products, including Hydroxycut Hardcore Liquid Caplets to burn fat and for energy enhancement.

218.    Prior to consuming HYDROXYCUT products, Plaintiff Marcia Homan read the package label.  Upon information and belief, at all relevant times, Plaintiff Marcia Homan ingested HYDROXYCUT products as recommended doses and in the manner contemplated by Defendants.

219.    In May, 2008, Plaintiff, Marcia Homan, was diagnosed with various liver complications by the Naval Hospital in 29 Palms, California and received medical treatment from that facility.

220.    Had Plaintiffs known of the risks and dangers associated with ingesting HYDROXYCUT products, or had Defendants disclosed such information to Plaintiffs, they would not have used said products.

221.    As a result of the designing, contracting to manufacture, manufacturing, advertising, promoting, marketing, selling, and distributing of HYDROXYCUT products, Defendants have

33

1  reaped huge profits, while concealing from the public knowledge of the unreasonably dangerous risks

2  associated with the ingestion of said products.

3      222.    Prior to Plaintiff's use of said products, Defendants knew or should have known that

4  when taken as directed, HYDROXYCUT products were potentially dangerous and injurious to many

5  of the consumers to whom they were marketed; however, Defendants failed to adequately warn users,

6  including Plaintiff, of the products' potentially dangerous effects, and their heightened danger when

7  taken in conjunction with an exercise regimen.

8      223.    Defendants, and each of them, acted with conscious and wanton disregard of the

9  health and safety of Plaintiffs, who each request an award of punitive damages based on these

10  Defendants' actual malice and intentional misconduct in concealing the risk of serious and life

11  threatening injury associated with HYDROXYCUT products, and for their gross negligence in failing

12  to undertake adequate testing of said products, in an amount sufficiently large to be an example to

13  others and to deter Defendants and others from engaging in similar conduct in the future.

14      224.    The above-described wrongful conduct was done with knowledge, authorization, and

15  ratification of officers, directors, and managing agents of Defendants.

16  <div align="center">**FIRST CAUSE OF ACTION**</div>

17  <div align="center">**NEGLIGENCE**</div>

18  <div align="center">**(AGAINST ALL DEFENDANTS)**</div>

19      225.    Plaintiffs incorporate by reference each and every prior paragraph of this Complaint as

20  though set forth herein:

21      226.    Defendants had a duty to exercise reasonable care in the designing, contracting to

22  manufacture, manufacturing, advertising, promoting, marketing, selling, and distributing

23  HYDROXYCUT products, including Hydroxycut Regular Rapid Release Caplets, including a duty to

24  ensure that the products were accompanied by adequate warnings and did not cause consumers to

25  suffer from unreasonably dangerous side effects.

26      227.    Defendants owed a duty to Plaintiffs to:

27          a)    conduct appropriate testing to determine whether and to what extent

28  ingestion of HYDROXYCUT products, including Hydroxycut Regular Rapid Release

<div align="center">34</div>
<div align="center">COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL</div>

Caplets, posed serious health risks, including, without limitation, liver damage, jaundice, seizures, cardiovascular complications, including stroke, rhabdomyolysis or death to a significant number of their prospective and actual consumers;

b)  discover or otherwise obtain knowledge that ingestion of said products carried the risk, with respect to a significant number of their prospective and actual consumers such as the Plaintiffs, of injuries including, without limitation, serious liver damage, jaundice, seizures, cardiovascular complications, including stroke, rhabdomyolysis, kidney failure or death;

c)  warn persons such as Plaintiffs Deloris Blaylock, James Larson, Ryan Johnson, James Burroughs, and Matthew Ryntz that ingestion of said products carried the risk, with respect to a significant number of their prospective and actual consumers such as Plaintiff, of injuries, including serious liver damage, jaundice, seizures, cardiovascular disorders including stroke, rhabdomyolysis, kidney failure or death; and timely implement a safer, alternative design for said products.

228.  Despite the fact that Defendants knew or should have known that HYDROXYCUT products, including Hydroxycut Regular Rapid Release Caplets, posed a serious risk of bodily harm to consumers, Defendants failed to exercise ordinary care in labeling, advertising and promoting said products, in that they failed to warn on said labeling, advertising, and promotion of the risk of serious bodily injury or death from the use of said products.

229.  Defendants were negligent in the research, development, design, testing, manufacture, inspection, labeling, distribution, marketing, promotion and sale of HYDROXYCUT products, including Hydroxycut Regular Rapid Release Caplets, into the stream of commerce in that they:

a)  failed to use due care in the designing, testing, and manufacturing of the products so as to prevent the aforementioned risks to individuals when using the products;

b)  failed to provide their products with proper warnings regarding possible adverse side effects associated with the use of HYDROXYCUT products, including Hydroxycut Regular Rapid Release Caplets,  known drug-drug interactions and drug-

food interactions, the risk of using these products in conjunction with exercise regimen and the comparative severity and duration of such adverse events;

c)      failed to conduct adequate pre-clinical and clinical testing and post-marketing surveillance to determine the safety of HYDROXYCUT products, including Hydroxycut Regular Rapid Release Caplets;

d)      failed to properly warn Plaintiff, prior to actively encouraging and promoting the sale of HYDROXYCUT products, including Hydroxycut Regular Rapid Release Caplets, either directly or indirectly, orally or in writing, about the adverse effects associated with the use of these products, including but not limited to liver damage, jaundice, seizures, cardiovascular disorders including stroke,  rhabdomyolysis, death, and other health problems.

230.    The Retailer Defendants were additionally negligent in selling HYDROXYCUT products, including Hydroxycut Regular Rapid Release Caplets, Hydroxycut Max Liquid Caplets, Hydroxycut Regular Drink Packets, Hydroxycut Max Liquid Caplets, Hydroxycut Liquid Shots, Hydroxycut Natural, and Hydroxycut Hardcore Liquid Capsules, after having learned through the Ephedra tragedy and subsequent litigation about the reckless manner in which the Manufacturing Defendants conducted business and the fact that they sold chemically active products for ingestion by consumers under the HYDROXYCUT name when such products had no meaningful safety testing. Nevertheless, these Retailer Defendants readily stocked their shelves with the newer iteration of dangerous and untested HYDROXYCUT products, including Hydroxycut Regular Rapid Release Caplets, reaping substantial profits.

231.    The Retailer Defendants were cognizant of the recklessness and lack of safety testing and monitoring of the Manufacturing Defendants following the Ephedra tragedy, but instead of declining to hawk their wares, they obtained indemnification agreements from the Manufacturing Defendants so that the Manufacturing Defendants would be responsible for defending the anticipated personal injury cases that the Retailer Defendants knew would evolve from the sale of these get rich quick products.

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

232.    The Retailer Defendants further enabled the Manufacturing Defendants to make representations concerning the quality of their products.  The Retailer Defendants adopted, and became responsible for, the representations made on HYDROXYCUT product packaging, including packaging of Hydroxycut Regular Rapid Release Caplets, regarding the safety and efficacy of the products, when they decided to place such products on their store shelves, window display cases and on retail websites, and thereafter advertised and sold such products to Plaintiffs.

233.    Despite the fact that Defendants knew or should have known HYDROXYCUT products, including Hydroxycut Regular Rapid Release Caplets, caused unreasonable and dangerous side effects which many users would be unable to remedy by any means, Defendants continued to market these products to consumers, including Plaintiffs, when safer alternative methods were available.

234.    Defendants knew or should have known that consumers such as Plaintiffs would suffer injury as a result of Defendants' failure to exercise ordinary care as described above.

235.    Defendants knew or should have known that the aforementioned products were not safe, fit or effective for human consumption, and that the use of said products was hazardous to the user's health, including but not limited to the injuries suffered by Plaintiffs, as described herein.

236.    As a direct and proximate result of the negligent conduct of the Defendants, Plaintiffs have suffered and continue to suffer serious and permanent physical, and emotional injuries, have suffered and will continue to suffer economic loss, and have otherwise been physically and emotionally injured to their damage in a sum greater than the jurisdictional limitations of all lower courts which would otherwise have jurisdiction.

237.    The conduct of said Defendants was intentional, wanton, willful and outrageous, beyond all standards of common decency, in reckless disregard and in callous indifference to the public and foreseeable consumers of HYDROXYCUT products.

238.    By virtue of the aforesaid, Plaintiffs are entitled to punitive damages against said Defendants.

## SECOND CAUSE OF ACTION

## STRICT LIABILITY IN TORT - FAILURE TO WARN

**(AGAINST ALL DEFENDANTS)**

239.    Plaintiffs incorporate by reference each and every prior paragraph of this Complaint as though set forth in full in this cause of action.

240.    At the time of Plaintiffs' injuries, Defendants' HYDROXYCUT products, including Hydroxycut Regular Rapid Release Caplets, were defective and unreasonably dangerous to foreseeable consumers, including Plaintiffs.

241.    Said products were expected to, and did reach the intended consumers, handlers, and persons coming into contact with the product without substantial change in the condition in which they were produced, manufactured, contracted to manufacture, sold, distributed, labeled, and marketed by Defendants.

242.    Defendants designed, contracted to manufacture, manufactured, advertised, promoted, marketed, sold, distributed and/or introduced HYDROXYCUT products, including Hydroxycut Regular Rapid Release Caplets, into the stream of commerce, and in the course of same, directly advertised or marketed said products to consumers or persons responsible for consumers, and therefore had a duty to warn of the risk associated with the use of such products.  All defendants were engaged in the business of selling Hydroxycut products, notwithstanding the fact that the products were sold directly to the consumer in the Retailer Defendants' retail outlets.

243.    Defendants knew and intended that said products would be purchased and consumed by members of the general public and would be used without a prescription and without any inspections for defects, or investigation into the veracity of the advertising claims and that consumers would rely upon the representations made by Defendants on the product label, websites, store-shelves and in other promotional and sales materials.

244.    Defendants' HYDROXYCUT products, including Hydroxycut Regular Rapid Release Caplets, were defective in design for, among other reasons, their inadequate warnings to consumers of their dangerous propensities, which dangers were known or should have been known to Defendants as they were scientifically readily available and there were safer alternative designs.

245.     Defendants failed to provide adequate warnings and/or information concerning the harms or potential harms and dangers of said HYDROXYCUT products to persons ingesting the products, including but not limited to Plaintiffs.

246.     Defendants failed to perform adequate testing which would have established that HYDROXYCUT products, including Hydroxycut Regular Rapid Release Caplets, possessed potentially serious and life-threatening side effects about which full and proper warnings accurately and fully reflecting the symptoms, scope and severity should have been made to medical care providers, the FDA and the public, including Plaintiff herein.

247.     As a direct and proximate result of Defendants' defective and unreasonably dangerous product, Plaintiffs have suffered damages as aforesaid.

## THIRD CAUSE OF ACTION

## STRICT LIABILITY IN TORT - DESIGN DEFECT

## (AGAINST ALL DEFENDANTS)

248.     Plaintiffs incorporate by reference each and every prior paragraph of this Complaint as though set forth in full in this cause of action.

249.     The time of Plaintiffs' injuries, Defendants' HYDROXYCUT products, including Hydroxycut Regular Rapid Release Caplets, were defective and unreasonably dangerous to foreseeable consumers, including Plaintiffs.

250.     At the time of Plaintiffs' injury, Defendants' HYDROXYCUT products, including Hydroxycut Regular Rapid Release Caplets, were defective and unreasonably dangerous to foreseeable consumers, including Plaintiffs.

251.     Said products were defective and unreasonably dangerous because they were known by Defendants to be capable of causing serious personal injuries including serious liver damage, jaundice, seizures, and cardiovascular disorders including stroke, rhabdomyolysis, death, and other health problems when used for their intended purposes in a foreseeable manner.

252.     Said products were also defective because the risks associated with HYDROXYCUT products, including Hydroxycut Regular Rapid Release Caplets, as aforesaid exceeded a reasonable buyer's expectations including those of Plaintiffs.

253.   Defendants' HYDROXYCUT products, including Hydroxycut Regular Rapid Release Caplets, were defective in design and/or formulation in that they lacked efficacy and their use posed a greater likelihood of injury than other weight-loss treatments, and were more dangerous than the ordinary consumer could reasonably foresee or would reasonably expect.

254.   Said products were defective and unreasonably dangerous in that they lacked efficacy and/or their foreseeable risks exceeded the benefits associated with their design or formation and lacked quality and dosage control.

255.   There existed safer alternative designs, but Defendants chose to market a more dangerous design.

256.   As a direct and proximate result of Defendants' defective and unreasonably dangerous product Plaintiffs have suffered damages as aforesaid.

## FOURTH CAUSE OF ACTION

## BREACH OF EXPRESS WARRANTY

## (AGAINST ALL DEFENDANTS)

### (CAL. U. COM. CODE § 2313(1), CAL. CIV. CODE § 1791.2(a))

257.   Plaintiffs incorporate by reference each and every prior paragraph of this Complaint as though set forth herein.

258.   Defendants, and each of them, expressed in their literature, advertisements, promotions and through representations by their marketing team that HYDROXYCUT products, including Hydroxycut Regular Rapid Release Caplets, were safe, effective and fit for the uses for which they were designed, manufactured and marketed, to "increase energy," "burn calories," "control appetite," and were of marketable quality.

On its website, Iovate stated:
Plain and simple, Hydroxycut was created to help you reach your weight-loss goals.  This medical doctor-formulated supplement contains ingredients that are of the highest quality and have been combined to make it one of the most effective weight-loss supplements available on the market today.  Hydroxycut® is comprised of a blend of research-proven key ingredients that can help you to lose up to 4.5 times the weight than diet and exercise alone.*

On top of that, this top selling weight-loss supplement increases your energy and helps control your appetite too.  With Hydroxycut in your diet and exercise plan, you'll be on your way to achieving your weight-loss goals in no time!

Similarly, in their television commercials, Iovate conveys the same message:

Announcer:      Millions of Americans have made Hydroxycut the #1 selling weight-loss supplement.

Consumer:      I'm Gillian from Illinois, and I lost 39 pounds FAST with Hydroxycut.

Dr. Jon. Marshall:      [Picturing man in white lab coat and prominently stamping "Dr. Jon Marshall Resident Physician" on the screen] Subjects using the patented primary ingredients in Hydroxycut lost an average of up to four and a half times the weight than with diet and exercise alone.  I strongly recommend it, both as a new doctor and as someone who used it with fantastic results.

Consumer:      I'm Catherine from Texas, and I lost 41 pounds with Hydroxycut.  It really works fast.

Announcer:      Get Hydroxycut today, and new Hydroxycut drink mix packets at stores everywhere.

The above efficacy claims are false, misleading and likely to deceive the consuming public.  Iovate does not have competent and reliable evidence supporting the claims.

259.    Defendants, on HYDROXYCUT product packaging, labels, advertisements and websites, including those of Hydroxycut Regular Rapid Release Caplets, heralded the efficacy of the products as "Americas #1 Selling Weight-Loss Supplement" and represented that HYDROXYCUT products:

a)      could be used to "increase energy," "burn calories," and "control appetite";

b)      "[Are] doctor-formulated with clinically proven ingredients to help you lose up to 4.5 times the weight than diet and exercise alone"; and

c)      Are made with "clinically proven ingredients," implying that they were natural, proven by some clinical testing to be safe, effective and could safely "burn" calories.

260.    HYDROXYCUT products' package label contained the following representations that formed express warranties:

41

1        a.     "Decreases bodyfat by an average of 7.9% more than control group";

2        b.     "Increases norepinephrine by 40% in 24 hours";

3        c.     "Maximum-strength thermogenesis";

4        d.     "Pharmaceutically inspired delivered for lightening-fact absorption";

5        e.     "Based on research conducted at the University of Laval"

6        f.     "Hydroxycut® Hardcore has been used by millions of people across America, and for good reason – it works fast! And now this powerful new formula, with the same scientifically-advanced ingredients as the original potent formula, features a key fat-burning component that has been infused with pharmaceutically-inspired Nano-Diffuse techonology! A precisely calculated portion of the main fat-burning component in Hydroxycut Hardcore has been nano-particulated to see up to an incredible 296 times smaller than conventional particles designed for ultra-fast absorption"

g.     "Years of science backs Hydroxycut Hardcore.  In a 12-week human clinical study, subjects using one of the key components in Hydroxycut® Hardcore reduced their body fat area by an incredible 7.9% more than the control group… And in a second clinical study conducted at the University of Laval, subjects using key components in Hydroxycut Hardcore burned significantly more calories per day than when using a placebo.  In another clinical study of these key components, subjects increased norepinephrine by an average of 40% in 24 hours."; and

h.     "for best results combine Hydroxycut® Hardcore with an intense training and nutrition program."

261.    By making said representations Defendants expressly warranted that the HYDROXYCUT products, including Hydroxycut Regular Rapid Release Caplets, were safe and effective, and fit for the uses for which they were designed, manufactured and marketed.

262.    Plaintiffs had no knowledge of the falsity or incompleteness of the Defendants' statements and representations concerning HYDROXYCUT products, including Hydroxycut Regular Rapid Release Caplets, when they purchased said products.

263.    Plaintiffs chose to purchase HYDROXYCUT products, including Hydroxycut Regular Rapid Release Caplets, based in part on the foregoing representations made by Defendants on HYDROXYCUT product packaging, labels, advertisements and websites.

264.    In fact, HYDROXYCUT products, including Hydroxycut Regular Rapid Release Caplets, were not safe, effective, fit, nor proper for the uses for which they were designed, manufactured, marketed and sold.  Thus Defendants committed breach of express warranty.

265.    As a direct and proximate result of Defendants' breach of express warranty, Plaintiffs have suffered damages as aforesaid.


## FIFTH CAUSE OF ACTION

## BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY

## (AGAINST ALL DEFENDANTS)

### (CAL. U. COM. CODE § 2314(1), CAL. CIV. CODE § 1792)

266.    Plaintiffs incorporate by reference each and every prior paragraph of this Complaint as though set forth herein.

267.    Plaintiffs purchased and ingested HYDROXYCUT products, including Hydroxycut Regular Rapid Release Caplets.  Defendants impliedly warranted that said products were merchantable and suitable for the ordinary purposes for which they were to be used.

268.    In fact, Defendants' HYDROXYCUT products, including Hydroxycut Regular Rapid Release Caplets, were not merchantable or fit for the ordinary purposes for which they were to be used and, therefore, Defendants breached the implied warranty of merchantability.

269.    As a direct and proximate result of Defendants' breach of implied warranty of merchantability, Plaintiffs, have suffered damages as aforesaid.

## SIXTH CAUSE OF ACTION

## BREACH OF IMPLIED WARRANTY

## OF FITNESS FOR A PARTICULAR PURPOSE

## (AGAINST ALL DEFENDANTS)

### (CAL. U. COM. CODE § 2315, CAL CIV. CODE §§ 1791.1 & 1792.1)

270.     Plaintiffs incorporate by reference each and every prior paragraph of this Complaint as though set forth herein.

271.     Defendants, and each of them, impliedly warranted that HYDROXYCUT products, including Hydroxycut Regular Rapid Release Caplets, were fit for the particular purpose for which they were being designed, manufactured, marketed and sold and for the purpose for which it was known to Defendants that they were purchased by consumers, including Plaintiffs.

272.     In fact, HYDROXYCUT products, including Hydroxycut Regular Rapid Release Caplets, were not fit for the particular purpose for which they were designed, manufactured, marketed and sold nor for the purpose for which it was known to Defendants that they were purchased by consumers, including Plaintiffs, therefore, Defendants breached the implied warranty of fitness for a particular purpose.

273.     As a direct and proximate result of Defendants' breach of implied warranty of fitness for a particular purpose, Plaintiffs have suffered damages as aforesaid.

## SEVENTH CAUSE OF ACTION

## INTENTIONAL MISREPRESENTATION

## (AGAINST MANUFACTURING DEFENDANTS)

274.     Plaintiff incorporates by reference each and every prior paragraph of this Complaint as though set forth herein.

275.     Manufacturing Defendants having undertaken the manufacturing, marketing, distribution and promotion, contracting to manufacture and labeling of HYDROXYCUT products, including Hydroxycut Regular Rapid Release Caplets, owed a duty to provide accurate and complete information regarding their products.

276.     Said Defendants, through their literature, advertisements, and promotions and through representations by their marketing representative's fraudulently misrepresented information regarding their HYDROXYCUT products, including Hydroxycut Regular Rapid Release Caplets, including but not limited to their propensity to cause serious, permanent and potentially life-threatening physical harm by providing false, incomplete and misleading information.

277.     Said Defendants made the aforesaid misrepresentations and actively concealed adverse information at the time that they knew or should have known that the referenced HYDROXYCUT products could cause serious liver damage, jaundice, seizures, cardiovascular disorders, rhabdomoyolysis or death, other than what said Defendants had represented to the general public.

278.     Said Defendants, through their literature, advertisements, and promotions and through representations by their marketing representatives fraudulently misrepresented information regarding the referenced HYDROXYCUT products, including that said products were backed by "more than 10 years of real, scientific research, including clinical studies on key components with actual human studies" and that said products contained "one-of-a-kind blend of superior ingredients, engineered to quickly and effectively burn bodyfat [sic]" knowing these statements to be false.

279.     Said Defendants intentionally concealed the fact that the use and consumption of HYDROXYCUT products, including Hydroxycut Regular Rapid Release Caplets, in the manner in which they were designed, manufactured and marketed could cause serious liver damage, jaundice, seizures, cardiovascular disorders, rhabdomoyolysis or death, with the intent to defraud and mislead users and the general public.

280.     Said Defendants, from the time the products were first manufactured and marketed and up until their withdrawal from the market, deceived consumers, including Plaintiffs by concealing the truth concerning HYDROXYCUT products, which the Defendants, as manufacturers, distributors and sellers of the products, had a duty to disclose.  Defendants further willfully deceived consumers and Plaintiffs, by falsely labeling these products as standardized, and by implying Defendants followed good manufacturing practices that, in fact, Defendants failed to employ.

281.     The concealments, misrepresentations, and false information communicated by Defendants were made with the intent to generate future products to the significant detriment of the public and the Plaintiff herein.

282.     Plaintiffs reasonably relied on the aforesaid fraudulent misrepresentations in selecting HYDROXYCUT products, including Hydroxycut Regular Rapid Release Caplets, for consumption.

283.     As a direct and proximate result of Defendants' fraudulent misrepresentation, Plaintiffs have suffered damages as aforesaid.

**EIGHTH CAUSE OF ACTION**

**NEGLIGENT MISREPRESENTATION**

**(AGAINST MANUFACTURING DEFENDANTS)**

284.	Plaintiff incorporates by reference each and every prior paragraph of this Complaint as though set forth herein.

285.	Manufacturing Defendants negligently misrepresented and failed to disclose material facts concerning the risks associated with HYDROXYCUT products, including Hydroxycut Regular Rapid Release Caplets, to the general public and Plaintiffs herein.

286.	At the time Defendants made the misrepresentations, as aforesaid, they knew or should have known that the representations were false or inaccurate.

287.	Defendants represented to consumers, including Plaintiffs, that the subject dietary supplements were safe, but Defendants had no knowledge to believe such to be true, had no reasonable basis for believing such to be true, and had no basis upon which said representations could be based.

288.	As such, said Defendants failed to exercise reasonable care in obtaining or communicating truthful information to the general public and Plaintiffs herein, and failed to comply with the existing standard of care.

289.	Plaintiffs reasonably relied on the aforesaid misrepresentations in selecting HYDROXYCUT products, including HYDROXYCUT REGULAR RAPID RELEASE CAPLETS, for consumption.

290.	As a direct and proximate result of Defendants' negligent misrepresentation, Plaintiffs have suffered damages as aforesaid.

///

///

///

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

**NINTH CAUSE OF ACTION**

**VIOLATION OF CONSUMER PRACTICES LAWS**

**(AGAINST MANUFACTURING DEFENDANTS)**

**(Cal. Civ. Code § 1750 *et seq.*)**

291.    Plaintiffs incorporate by reference each and every prior paragraph of this Complaint as though set forth in full in this cause of action.

292.    Defendants falsely stated, in violation of Cal. Civ. Code § 1750 *et seq.*, the safety, efficacy, quality and grade of their HYDROXYCUT products, including Hydroxycut Regular Rapid Release Caplets, and the ingredients contained in these products as aforesaid, with the intent to mislead consumers, including Plaintiffs, to believe that said products were clinically proven, and a safe and effective way to lose weight and increase energy, which they were not.

293.    Plaintiffs relied on the aforesaid misrepresentations in selecting and consuming HYDROXYCUT products, including Hydroxycut Regular Rapid Release Caplets.

294.    As a direct and proximate result of Defendants' violation of Cal. Civ. Code § 1750 *et seq.* Plaintiffs have suffered damages as aforesaid.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray for relief as follows:

1.    Compensatory damages in excess of the jurisdictional amount including but not limited to pain and suffering, emotional distress, loss of enjoyment of life, inconvenience, physical impairment, past and future loss of bodily function,  and other non-economic damages in an amount to be determined at the trial of this action;

2.    Medical expenses, income, and other economic damages in an amount to be determined at the trial of this action;

3.    Restitutionary damages in the amount that the Defendants have been unjustly enriched;

4.    Punitive damages against Iovate Health Sciences USA, Inc., Iovate Health Sciences, Inc., Iovate Health Sciences Research, Inc., Iovate Health Sciences Group, Inc. N/K/A Kerr Investment Holding Corp, Iovate Health Sciences International, Inc., Muscletech Research and

Development, Inc., Vitaquest International, LLC, and Garden State Nutritionals, Inc. in an amount to be determined at the trial of this action;

     5.     Pre and post judgment interest;

     6.     Attorneys' fees, expenses, and costs of this action as allowed by law; and

     7.     Such additional and further relief as the Court deems just and proper.

DATED:   April 13, 2012

Respectfully submitted,


By   /s/ David L. Wiseman, Esq.

David L. Wiseman (State Bar No. 246913)
LAW OFFICES OF DAVID L. WISEMAN
455 Capitol Mall, Suite 350
Sacramento, CA 95814
Telephone: (916) 441-6575
Facsimile:   (916) 441-6553
E-mail address: wiseman@thewisemanlawfirm.com

Matthew J. Sill (OK State Bar No. 21547)
SILL LAW GROUP, PLLC
14005 N. Eastern Avenue
Edmond, OK 73103
Telephone: (405) 509-6300
Facsimile: (405) 509-6268
Email Address:  matt@sill-law.com

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

1

## JURY TRIAL DEMANDED

2        Plaintiffs demand that all issues of fact in the case be tried by a properly impaneled jury to the

3   extent permitted under the law.

4               DATED:   April 13, 2012

5                                    Respectfully submitted,

6

7                                 By__/s/ David L. Wiseman, Esq._____

8                                    David L. Wiseman (State Bar No. 246913)
                                     LAW OFFICES OF DAVID L. WISEMAN
9                                    455 Capitol Mall, Suite 350
                                     Sacramento, CA 95814
10                                   Telephone: (916) 441-6575
                                     Facsimile:   (916) 441-6553
11                                   E-mail address: wiseman@thewisemanlawfirm.com

12                                   Matthew J. Sill (OK State Bar No. 21547)
                                     SILL LAW GROUP, PLLC
13                                   14005 N. Eastern Avenue
                                     Edmond, OK 73103
14                                   Telephone: (405) 509-6300
                                     Facsimile: (405) 509-6268
15                                   Email Address:  matt@sill-law.com

16

17

18

19

20

21

22

23

24

25

26

27

28

COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL